# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| TERRY E. PIERCE,<br><br>    Plaintiff,<br><br>vs.<br><br>FORT DODGE ANIMAL HEALTH, a division of WYETH,<br><br>    Defendant. | No. C 03-3056-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

_____

# TABLE OF CONTENTS

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . 6
   *B. Pierce's Disability Discrimination Claims* . . . . . . . . . . . . . . . . . 9
      *1. Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
         *a. Disability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
         *b. Qualification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
         *c. Possible accommodation* . . . . . . . . . . . . . . . . . . . . . 13
         *d. Adverse employment action because of disability* . . . . 14
         *e. Summary judgment versus determination on the merits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## I. INTRODUCTION

This litigation pursuant to the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216, arises from plaintiff Terry E. Pierce's termination on July 26, 2002, from her position as the payroll manager for defendant Fort Dodge Animal Health (FDAH). Pierce contends that her disability—depression, anxiety, and trichotillomania[1]—was the determining factor in her discharge and that FDAH failed to reasonably accommodate her disability. FDAH, on the other hand, contends that Pierce was terminated for chronic tardiness and absenteeism.

### A. *Procedural Background*

Plaintiff Pierce filed the present lawsuit on June 25, 2003. In her "First Cause Of Action," Pierce alleges disability discrimination in violation of the ADA, consisting of discriminatory discharge and failure to accommodate her disability.[2] In her "Second Cause Of Action," Pierce alleges disability discrimination in violation of the ICRA.

---

[1] "The essential feature of Trichotillomania is the recurrent pulling out of one's own hair that results in noticeable hair loss." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 674 (4th ed. 2000) (DSM-IV-TR). "Hair pulling often occurs in states of relaxation and distraction . . . but may also occur during stressful circumstances." *Id.*

[2] Pierce's Complaint could also be read to assert a claim of "perceived disability" discrimination, *see, e.g.,* Complaint (docket no. 1), ¶ 16, and, indeed, FDAH has moved for summary judgment on any such claim. However, in her resistance to FDAH's motion for summary judgment, Pierce expressly states that this is not a "regarded as disabled" case. *See* Plaintiff's Brief In Support Of Resistance To Defendant's Motion For Summary Judgment (docket no. 25), 19. Therefore, the court will give no further consideration to any "perceived disability" claim.

FDAH answered Pierce's Complaint on September 5, 2003, and this matter proceeded to discovery. Trial in this matter was eventually scheduled for September 12, 2005.

However, in a motion for summary judgment, filed March 11, 2005 (docket no. 24), FDAH contends that there are no genuine issues of material fact as to the following: (1) that Pierce was not "disabled" within the meaning of the ADA or the ICRA, because she was not substantially limited by any impairment in any major life activity, but instead chose to be chronically late for work; (2) that Pierce was not "qualified" for her job at FDAH, because compliance with her work schedule was an essential element of her job, and her chronic tardiness and absenteeism, purportedly resulting from her depression and anxiety disorders, could not be reasonably accommodated; (3) that FDAH attempted to reasonably accommodate Pierce's disability, but that Pierce's tardiness and absenteeism, purportedly resulting from her depression and anxiety disorders, either could not be reasonably accommodated, or Pierce never identified any possible reasonable accommodation; and (4) that Pierce was not terminated because of any disability, but because of her chronic tardiness and absenteeism. Therefore, FDAH contends that it is entitled to summary judgment on Pierce's claims. Pierce contends that she has generated genuine issues of material fact on each of these issues, so that she is entitled to take her disability discrimination claims to trial.

Unfortunately, the court could not reach FDAH's motion for summary judgment in a more timely fashion, owing to the court's involvement during April, May, and June in the trial of the second death-penalty case on its docket, *United States v. Angela Johnson*, CR 01-3046-MWB (N.D. Iowa), the backlog of criminal cases with speedy trial requirements resulting from the *Johnson* trial and the court's prior involvement in its first death-penalty case, *United States v. Honken*, CR 01-3047-MWB (N.D. Iowa), during the preceding fall and winter, and the need for the court to complete an extensive ruling, filed

3

at the end of last month, on the complicated issues in the post-trial motions in the *Honken* case. Similarly, although Pierce requested oral arguments on FDAH's motion for summary judgment,[3] the court finds that its present crowded schedule cannot accommodate such oral arguments within a reasonable time before trial, nor does the court find that oral arguments are necessary in light of the issues in the case. Therefore, the court deems FDAH's motion for summary judgment to be fully submitted on the written record and arguments.

## *B. Factual Background*

The court will not attempt here an exhaustive dissertation of the undisputed and disputed facts in this case, but will, instead, survey sufficient of the facts to put in context the parties' arguments for and against summary judgment. That survey includes pertinent points in Pierce's employment history and her medical treatment for depression, anxiety, and trichotillomania.

Pierce was employed as the payroll manager for FDAH from April 14, 1997, to July 26, 2002. She contends that, until the last few months of her employment with FDAH, she and the other employees in her department, as well as her supervisor, worked flexible hours, depending upon the work load from various projects. Indeed, she contends that she frequently worked well in excess of forty hours per week, often working well into the night several days in a row. FDAH, however, contends that it was necessary for

---

[3] Pierce's request for oral arguments was not in compliance with the applicable local rule, which provides that "[a] request for oral argument must be noted separately in both the caption and the conclusion of the . . . resistance to the motion." N.D. IA. L.R. 56.1(f). Consequently, Pierce's request for oral arguments was overlooked at the time when it might have been possible to set oral arguments in a timely fashion.

Pierce to work the company's standard 8:00 a.m. to 5:00 p.m. schedule, so that she could supervise employees under her, and so that she could communicate with or be available to supervisors and employees at the Fort Dodge facility and other facilities, including the offices of FDAH's parent company, Wyeth, on the east coast. Pierce does not dispute that she had not worked an 8:00 a.m. to 5:00 p.m. schedule or that she was often hours "late" for work, frequently without warning to her staff or supervisor. However, she attributes these facts to both the nature of her work at FDAH and her mental health problems.

In fact, Pierce asked for a "flexible schedule" on September 5, 2001, because she was having difficulties with stress and anxiety. Pierce had begun receiving treatment from a psychiatrist and a medical social worker for depression and anxiety at some point in 2001. Pierce's supervisor, Tom Sullivan, suggested that Pierce could come in at 8:30 a.m., but Pierce responded that a half-hour later start time, or any other specific start time, would not solve the problem she was having with getting to work at a specified time. After the conclusion of a particularly stressful project, Pierce requested medical leave beginning on October 10, 2001. Leave was granted, and Pierce was off on sick leave until December 13, 2001. On December 13, 2001, Pierce's psychiatrist, Dr. Ajayi, released her to work from home for up to three hours per day. On December 27, 2001, Dr. Ajayi released her to work for a half day, starting on January 3, 2002. Pierce's supervisor apparently insisted that the half day be from 8:00 a.m. to noon, which Pierce contends increased her anxiety and difficulties with getting to work by a scheduled time. On January 24, 2002, Dr. Ajayi released Pierce for full-time work beginning January 28, 2002.

Pierce continued to have difficulties getting to work by 8:00 a.m. She testified in deposition that her difficulties with getting to work on time arose, *inter alia*, from her "inability to choose the right clothes for the day, considering what I had to do that day,

5

who I was going to meet with, this constant indecision." FDAH has submitted records indicating that, in 2002, during the months prior to her termination, Pierce was late for work fifty-three times, exclusive of days that she did not come in to work at all. Pierce received her first official written warning about her tardiness—in addition to various e-mails from her supervisor complaining about times when she was not in her office, was late, or did not come to work at all—on March 19, 2002. FDAH issued a second written warning on July 8, 2002, but also moved Pierce's starting time from 8:00 a.m. to 8:30 a.m. in an attempt to make it easier for her to meet the required schedule. Pierce was unable to comply with this revised schedule. On July 15, 2002, Dr Ajayi wrote to Tim Carlson, the director of human resources at FDAH, requesting "flexibility in [Pierce's] starting time for work." Defendant's Appendix at 27. Dr. Ajayi explained, "Her condition and treatment may make her wake up at a later time." *Id*. Although FDAH requested clarification from Dr. Ajayi about what sort of "flexibility" was required, Dr. Ajayi did not respond immediately. On July 23, 2002, Pierce failed to appear for work and did not notify FDAH of a reason for her absence. FDAH then terminated Pierce's employment, effective July 26, 2002, citing chronic tardiness and absenteeism. Pierce then filed a claim for unemployment compensation, which shows an "effective date" of July 21, 2002, although Pierce contends that the application was not actually filed until after July 26, 2002.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

As this court has often explained, applying the standards of Rule 56 of the Federal Rules of Civil Procedure, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to

determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). The movant must make sufficient showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on the opposing party's claims. *See Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (on a motion for summary judgment pursuant to Rule 56, the moving party bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). To defeat a motion for summary judgment, the opposing party must then meet its countervailing burden under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). As this court has also often explained, the rule in this circuit is that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)). The court will apply these standards to FDAH's Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying these principles

7

to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination, except in the rarest case, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII—than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory intent nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true because the very best workers are seldom employment discrimination plaintiffs—since the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id*. Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.*

With the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the legal standards for Pierce's disability discrimination claim.

### B. Pierce's Disability Discrimination Claims

#### 1. Applicable law

A plaintiff establishes a *prima facie* case of disability discrimination by showing (1) a disability within the meaning of the ADA or Iowa law; (2) qualifications to perform the essential functions of the job, with or without reasonable accommodation; and (3) an adverse employment action due to a disability. *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1040 (ADA case) (citing *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1316 (8th Cir. 1996)); *Casey's General Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003) ("Like the ADA, to recover under the Iowa statute, a claimant must establish: (1) he or she is a disabled person; (2) he or she is qualified to perform the job, with or without an accommodation; and (3) he or she suffered an adverse employment decision because of the disability.").[4] Each of these elements is at issue on FDAH's motion for summary judgment.

#### 2. Analysis

##### a. Disability

As to the first element of Pierce's *prima facie* case, "disability," the courts have explained that "'[m]erely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life

---

[4]The parties do not assert, and the court does not find, that any difference between federal and Iowa disability discrimination law is dispositive in this case.

activity.'" *Brunke v. Goodyear Tire & Rubber Co.*, 344 F.3d 819, 821 (8th Cir. 2003) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002)). "Determining whether a major life activity has been substantially limited is an individualized inquiry." *Id.* A person is "substantially limited" in the major life activity of "working," if one is "unable to work in a wide range of jobs," not just a particular job. *Wenzel*, 404 F.3d at 1041; *Knutson v. Ag Processing, Inc.*, 394 F.3d 1047, 1050 (8th Cir. 2005) ("When the major life activity at issue is working, 'the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.'") (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999)).

FDAH contends that Pierce was not "substantially limited" in the major life activity of "working," because she testified that, once she gets to work, she is able to function effectively; her therapist has identified her chronic tardiness as a "choice," not a result of any disability; and Pierce has opined that she is ready and able to work at a broad range of jobs. FDAH also contends that, despite Pierce's chronic tardiness and absenteeism, even if those are caused by her mental condition, Pierce could work a variety of jobs that allowed her to work from home or that did not require a fixed schedule and regular attendance. Pierce contends, to the contrary, that her tardiness and absenteeism were caused by her mental condition and that she is disqualified thereby from the whole range of jobs requiring a fixed schedule or that do not tolerate tardiness.

The court notes, first, that Pierce has generated a genuine issue of material fact that her tardiness and absenteeism is caused by her mental condition, because Dr. Ajayi explained to FDAH in his July 15, 2002, letter that "[Pierce's] condition and treatment may make her wake up at a later time." Defendant's Appendix at 27. The court also finds that there is, at least, a genuine issue of material fact that Pierce's chronic tardiness and

absenteeism, which may result from her mental condition, would make her unable to work in a "wide range" or a "broad class" of jobs. *Wenzel*, 404 F.3d at 1041; *Knutson*, 394 F.3d at 1050. She is (or may be) disqualified by her mental condition from the whole range of jobs that require adherence to a specific schedule, including many such jobs in offices, manufacturing, or services. The fact that FDAH can identify some segment of jobs that may not have such "timeliness" requirements simply turns the analysis on its head: The question is not whether there is some segment of jobs that the plaintiff *can* perform, but whether she is *unable to perform* a broad class or wide range of jobs, which a reasonable juror could infer is Pierce's situation. *See id*. Thus, based on the record evidence, Pierce has generated genuine issues of material fact that she is "disabled" within the meaning of the ADA and Iowa law. *See* FED. R. CIV. P. 56(e) (to defeat a motion for summary judgment, the opposing party must go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial" ); *Celotex*, 477 U.S. at 324.

### b. *Qualification*

The court, therefore, turns to the issue of whether Pierce was "qualified" to perform the essential functions of her position at FDAH, either with or without reasonable accommodation. *See Wenzel*, 404 F.3d at 1040 (the second element of the plaintiff's *prima facie* case of disability discrimination is that the plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation). This is the most hotly contested issue in the case and, indeed, one that the court finds to be a very close question.

Although FDAH does not dispute Pierce's professional abilities, skills, or education, FDAH asserts that Pierce was not "qualified" for her job at FDAH, because regular and reliable attendance is a necessary element of most jobs, which Pierce could not

meet. FDAH contends, further, that Pierce's inability to get to work reliably and on time could not be accommodated, in light of her own testimony that any specific start time would not make it possible for her to get to work on time. A vague "flexibility" accommodation, FDAH contends, amounts to letting Pierce work when she felt like it, which was not reasonable for a person in her position, where she had to supervise others and be available at reasonable and reliable times to employees in the Fort Dodge and east coast facilities. Pierce contends, to the contrary, that a "flexible" work schedule had been the rule at FDAH, for her, her underlings, and her supervisors, until the last few months of her employment. She contends that the reason for the sudden assertion that timely attendance was an essential function of her job was animosity toward her as the result of her mental condition. She also contends that the company policy upon which FDAH relies for its assertion that timely attendance had always been an essential function of her job actually is a Wyeth policy that was never in force at FDAH while she was employed there. She contends that focusing on her supposed "tardiness" overlooks the fact that she worked vastly more than forty hours most weeks, and completed her projects in a timely manner. She contends, as well, that a "flexible" schedule had been, and reasonably could have been, accommodated.

While FDAH is correct that "regular and reliable attendance is a necessary element *of most jobs*," *Greer v. Emerson Electric Co.*, 185 F.3d 917, 921 (8th Cir. 1999) (emphasis added), there is, nevertheless, a genuine issue of material fact as to whether regular and reliable attendance was a necessary element *of Pierce's job at FDAH*. Pierce has pointed to sufficient evidence in the record to call into doubt FDAH's assertions that it had, and enforced, a regular attendance policy or that Pierce was not suffered willingly to work the irregular hours that various records, including records of use of her access card for secured doors to the Fort Dodge facility, plainly indicate that she worked.

12

Therefore, FDAH is not entitled to summary judgment on the ground that Pierce cannot generate a genuine issue of material fact on the second element of her *prima facie* case.

### c. *Possible accommodation*

The court turns, next, to FDAH's contention that it attempted to reasonably accommodate Pierce's disability, but that Pierce's tardiness and absenteeism either could not be reasonably accommodated, or Pierce never identified any possible reasonable accommodation.[5] Again, the court found, above, that there were genuine issues of material fact as to whether or not Pierce's impairment could be reasonably accommodated by some form of "flexible scheduling." Moreover, as to Pierce's failure-to-accommodate claim, both parties point fingers at each other for the breakdown of the required interactive process to determine what accommodations can reasonably be employed in a particular case of disability. *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005) ("If the employee needs an accommodation, the employer must engage in an interactive process [that is] informal and flexible, enabling the employer and employee to identify the employee's limitations and accommodations."). Although the plaintiff "triggers" the "interactive process" by requesting an accommodation, and informing the employer of the needed accommodation, the employer must act in good faith to assist the

---

[5]This assertion goes to both the second element of Pierce's disability discrimination claim and to her failure-to-accommodate claim. "The ADA prohibits an employer from discriminating against a qualified individual with a disability by failing to make 'reasonable accommodations to the known physical or mental limitations' of that individual." *Boersig v. Union Elec. Co.*, 219 F.3d 816, 821 (8th Cir. 2000) (quoting 42 U.S.C. § 12112(b)(5)(A)). Although, "at least in this Circuit, failure to accommodate and disparate treatment are two separate theories of liability under the ADA," *Voeltz v. Arctic Cat, Inc.*, 406 F.3d 1047, 1051 (8th Cir. 2005) (citing *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004)), one issue on FDAH's motion for summary judgment on both claims is the same: whether Pierce's disability could be reasonably accommodated.

employee in determining what accommodations are reasonable. *Id.* The record suggests that there is plenty of blame to go around here: It is unclear whether Pierce's requests for an accommodation were ever sufficiently specific for FDAH to evaluate, and it is equally unclear whether FDAH ever worked in good faith to determine a reasonable accommodation. Under these circumstances, the court concludes that the issues of whether Pierce's disability could be reasonably accommodated and which party is responsible for the breakdown of the interactive process are for a jury to decide.

### *d.     Adverse employment action because of disability*

Finally, the court comes to FDAH's contention that the record shows, beyond dispute, that Pierce was not terminated because of any disability, but because of her chronic tardiness and absenteeism. To generate a *prima facie* case of disability discrimination, the plaintiff must also show that an adverse employment action was due to the plaintiff's disability. *Wenzel*, 404 F.3d at 1040 (final element of the *prima facie* case). FDAH has certainly identified an adequate basis in the record for its contention that Pierce was terminated for chronic tardiness and absenteeism. Indeed, no employer could reasonably be expected to tolerate the sort of chronic tardiness and absenteeism that Pierce's employment record displays, *in the absence of evidence that the chronic tardiness and absenteeism was caused by a disability of which the employer is aware and for which the employee sought accommodation*. However, here, there is evidence from which a reasonable juror could find that Pierce's absenteeism and tardiness were caused by her mental disorders, that FDAH knew about her mental disorders and the problems they were causing with her attendance, and that Pierce had sought an accommodation for her mental disorders. Moreover, this issue of discriminatory animus or connection between the plaintiff's protected characteristic and adverse employment action is one that often turns on inferences from the record. On such an issue, the court believes that it should be

14

particularly hesitant to grant summary judgment, *see, e.g., Crawford*, 37 F.3d at 1341 (because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases) (citing *Johnson*, 931 F.2d at 1244), at least where the plaintiff employee can point to evidence giving rise to reasonable inferences of adverse employment action attributable to a protected characteristic. Here, Pierce has pointed to such evidence. She has pointed out that, at least prior to her sick leave for her mental condition, flexible scheduling was the norm, and that both her underlings and her supervisors regularly worked flexible hours; that the sudden attention to whether or not she was adhering to scheduled work hours arose after she admitted to stress and other mental problems and took sick leave to address them; and that her supervisor made hostile comments about another employee who had found her job too stressful, suggesting a discriminatory animus by the decision maker. Upon the present record, the court concludes that a jury question is also presented on the final element of Pierce's *prima facie* case.

### e. *Summary judgment versus determination on the merits*

This is not to say that the court is, in the least, persuaded by Pierce's claims. Indeed, were the court the trier of fact, and were the court presented with this record, the court would not hesitate to find in FDAH's favor on Pierce's claims of disability discrimination and failure to accommodate her disability. The court, and any other factfinder, could reasonably conclude that, although Pierce had a mental disorder, timely attendance was an essential function of her job as payroll manager at FDAH, where her presence during regular business hours was necessary to the supervision of her staff and to access to her by supervisors at the Fort Dodge facility and other employees or managers at Wyeth's offices on the east coast. The court, and any other factfinder, could also reasonably conclude that Pierce's mental disorders could not be reasonably accommodated,

and that Pierce never proposed a reasonable accommodation for them. Indeed, a factfinder could reasonably find on the present record that FDAH was more than generous in its attempts to accommodate Pierce's disability, and her resulting attendance problems, for as long as it did. A factfinder could reasonably conclude that, at some point, continued tardiness and absenteeism, on the scale that Pierce had such problems, could not be reasonably accommodated and that FDAH was justified in terminating a person with such attendance problems. The court cannot make these findings at the summary judgment stage of the proceedings, however, because the trial judge's function at this stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick*, 90 F.3d at 1376-77; *Johnson*, 906 F.2d at 1237. In this case, the court concludes that there are such genuine issues for trial.

## III. CONCLUSION

Upon the foregoing, defendant FDAH's March 11, 2005, Motion For Summary Judgment (docket no. 24) is **denied** in its entirety. This matter will proceed to trial, which is currently scheduled for September 12, 2005.

**IT IS SO ORDERED.**

**DATED** this 17th day of August, 2005.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA